**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 7** |
| | ) | |
| | ) | |
| **DAVID B. GROMADA,** | ) | **CASE NO. 05-75683** |
| | ) | |
| | ) | |
| DEBTOR. | ) | |

**MEMORANDUM DECISION**

The matter before the Court is the United States Trustee's Motion to Dismiss Pursuant to 11 U.S.C. § 707(b) filed February 13, 2006 in which the United States Trustee alleges that the Debtor, David B. Gromada, has available disposable income to make a substantial repayment of his unsecured debt over the course of a 36 month chapter 13 plan and that his bankruptcy filing constitutes a "substantial abuse" of the provisions of chapter 7 of the Bankruptcy Code. The Debtor's chapter 7 case was filed on October 15, 2005 and therefore is controlled by the law in effect prior to the adoption of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). This present matter was set for trial and heard on October 11, 2006. This matter has been fully briefed by the parties and is now ready for decision. For the reasons stated below, the Court will grant the United States Trustee's Motion.

DISCUSSION OF PARTIES' CONTENTIONS AND EVIDENCE

When prosecuting a motion to dismiss for alleged substantial abuse, Federal Rule of Bankruptcy Procedure 1017(e)(1) requires the United States Trustee to "set forth in the motion all matters to be submitted to the court for its consideration at the hearing." The matters

relied upon by the United States Trustee may be summarized as follows:  The Debtor has a gross monthly income of $6,303 ($75,636 per year) and a net monthly income of $3,276 after payroll deductions.  The Debtor's total liabilities consist of $60,080, of which $51,231 is general unsecured debt.  The Debtor's only secured debt consists of a $8,849 loan secured by the Debtor's 2002 Chrysler Van which he intends to surrender.  The Debtor's monthly expenses are scheduled as $4,504.91.  The Debtor's monthly budget includes excessive expenses such as $430 per month for entertainment, $150 per month for clothing, $200 per month for an unsubstantiated support obligation, and $645 for food for one person.  Reasonable adjustments to, or elimination of, these excessive expenditures would provide the Debtor with disposable income to fund a 36 month chapter 13 plan that would substantially repay his general unsecured debt.

In his Motion, the United States Trustee makes the following assertions relating to the application of the factors enumerated in the Fourth Circuit Court of Appeals' decision in *Green v. Staples (In re Green)*, 934 F.2d 568 (4th Cir. 1991) to the alleged facts presented in this case.  The totality of the circumstances in this case give rise to an abuse of the provisions of chapter 7.  With regard to the primary factor of the test, the ability to repay debts, the Debtor has the ability to repay a substantial portion of his unsecured debt because he can make reasonable adjustments to his budget which would allow him to fund a 36 month chapter 13 plan. Regarding the other *Green* factors, the Debtor's situation is not the result of sudden illness, calamity, disability, or unemployment but the result of living beyond his means.  He has excessive unsecured debt that consists almost entirely of amounts owed for credit cards, retail accounts, and personal loans.  Furthermore, the Debtor's budget is excessive as it includes $430 per month for entertainment, $150 per month for clothing, $200 per month for an unsubstantiated support obligation, and $645 for food for one person.  As to the accuracy of the information

disclosed in the bankruptcy schedules and statements, "[t]he U. S. Trustee reserves comment . . .

until discovery is completed."  As to the issue of good faith, the Unites States Trustee's assertion

has nothing to do with the facts of Mr. Gromada's case and apparently represents an inadvertent

repetition of allegations made in a case involving other debtors.

EVIDENCE PRESENTED AT TRIAL

It is undisputed that the Debtor is twice divorced and has one son who lives with

the Debtor's first wife while attending college in New York.  The Debtor currently lives with his

girlfriend in a home that she owns in Blue Ridge, Virginia, which, according to Mr. Gromada,

involves about a forty mile per day round-trip commute to his job.  He pays his girlfriend rent,

which includes utilities, to live in her home.  When he first started working in this area for his

current employer he lived at Extended Stay for about four months and then in Troutville until

deciding to move in with his girlfriend.  No evidence was offered comparing his previous

lodging expense with the rent he now pays.  The Debtor's Schedule I represented that his

currently gross monthly income at Walker Machine and Foundry is $6,303, and his net monthly

income is $3,276 after payroll deductions.  The Debtor's schedules reported monthly payroll

deductions of $3,027 which includes a $1,009 per month deduction for court ordered child

support.  The Debtor's child support is paid directly to his first wife for the support of their son.

The United States Trustee does not dispute the accuracy of the Debtor's reported income and

related deductions.  At trial, the Debtor testified that he does not believe there will be any change

in his salary and that he is obligated to continue paying child support at the current rate until his

son graduates from college.  The son is now in his second year of college.

The Debtor's schedules reported that he owns no real estate but that he owns

personal property with a total value of $4,084.02, all of which has been claimed as exempt.  At

the time of the petition, the Debtor also owned a 2002 Chrysler van which was not included in his list of scheduled personal property (Schedule B).  It was disclosed, however, in the Debtor's Statement of Intention and his list of secured creditors (Schedule D); the Statement of Intention indicated that he intended to surrender the van to the secured creditor.  At trial, the Debtor testified that the van was worn out and had 142,000 miles on it when it was surrendered to the creditor after filing his petition in this Court.  The Debtor's schedules list no other secured creditors nor any priority creditors.

The Debtor's schedules represented that his monthly living expenses are $3,178 per month.   Against his net monthly income of $3,276, these reported expenses would leave the Debtor with excess disposable income of $98 per month.  At trial, the Debtor testified that his Schedule J is no longer accurate because his rent has gone up $250 per month to cover the increased cost of utilities and taxes and his car insurance has gone up approximately $50 per month.  How his car insurance went up although he has surrendered the only motor vehicle he owned was not explained, but neither was it questioned at trial by either counsel for the United States Trustee or the Court.  The Debtor introduced his Exhibit A at trial, without objection, to reflect these changes in his expenses.  The itemization of the monthly expenses as reported on Schedule J and Debtor's Exhibit A is as follows:

|  | Schedule J | Exhibit A |
|---|---|---|
| Rent - including utilities | $750.00 | $1,000.00 |
| Cable and Internet | $90.00 | $90.00 |
| Food | $645.00 | $645.00 |
| Clothing | $150.00 | $150.00 |
| Medical and Dental Expenses | $67.00 | $67.00 |
| Transportation (not including car payments) | $550.00 | $550.00 |
| Recreation | $430.00 | $430.00 |
| Auto Insurance | $97.00 | $149.00 |
| Payments for support of additional dependents not living at your home | $200.00 | $200.00 |
| Miscellaneous | $125.00 | $125.00 |

| Storage | $74.00 | $74.00 |
|---|---|---|
| **Total Expenses** | **$3,178.00** | **$3,480.00** |

In addition to the expenses and associated changes listed above, the Debtor testified that he expected to incur additional indebtedness to purchase a new car before the end of the year. He stated that this is a necessary expense because he will only have access to the car he is currently driving until the end of the year as it is a company car that was loaned to him by Walker Machine and Foundry. The Debtor estimated that such a purchase would require him to undertake a payment of approximately $300 per month. Mr. Gromada testified that he makes regular trips to New York by car to assist his aging parents and that approximately $200 of his $550 per month transportation expense is attributable to those trips. He further testified that the $430 per month for recreation included $186 for cigarettes (two packs a day), most of the rest is for meals and incidental expenses he incurs in his trips to New York, an expenditure which he estimated at $250 per month. He further testified that he pays $30 for a haircut. If the Debtor's figures are accepted as correct concerning his increased rent and insurance as well as his estimated car payment, the Debtor's total monthly expenditures, after undertaking a note to purchase a car, will increase to $3,780 per month, $504 more than his current net monthly income.

## EVIDENCE FROM EXHIBITS

The Debtor's schedules reported general unsecured claims totaling $51,231. This debt is comprised of one account for medical services with a balance of $190, two personal loans with a total combined balance of $20,000, four credit card accounts with a combined total balance of $16,569, and eight other consumer accounts having a combined total balance of $14,427. The Debtor has not made any contention that these debts are not "consumer debts" within the meaning of 11 U.S.C. § 707(b) or that such status has not been proved.

According to the Debtor's Statement of Financial Affairs, during the three calendar months preceding his bankruptcy filing on October 15, 2005 he made 13 separate payments to three creditors.  Banknorth, which held a security interest in the Debtor's 2002 Chrysler van, received 3 payments on July 1, August 1, and September 1 totaling  $1,700.  Roger Lew, who had made a personal loan to the Debtor prior to 2002, received 3 payments on July 15, August 15, and September 15 totaling $810.  Walker Machine and Foundry, which made a personal loan to the Debtor in 2003 for moving and living expenses and is his current employer, received 7 payments on July 22, August 3, 6, 17, 20 and 31, and September 14 totaling $700. The balances owing to these three creditors as of the petition date were reported by the Debtor in his schedules as $1,700 to Banknorth[1], $15,000 to Mr. Lew, and $5,000 to Walker Machine and Foundry.  Such Statement also discloses a payment to the office of his bankruptcy counsel on September 21, 2005 for retainer and court filing fee in the amount of $1,125, gambling losses of $500 each on June 4, 2005 and July 24, 2005, and a cash gift of $1,000 on July 24, 2005 to his son for a graduation present.  The only disclosed source to make these various payments other than Mr. Gromada's regular earnings was the closing of an IRA account at Wachovia Bank, N.A. in the amount of $1,572.62 on June 28, 2005.[2]  The net result of these transactions is a cash outgo from Mr. Gromada for unbudgeted payments for the months of July thru September 2005 totaling, according to his own figures, $5,835, against receipts, other than salary, of $1,572.62 on

---

[1] This creditor filed a proof of claim asserting a filing date balance of $9,122.32 for this account.  It later filed a motion to approve an agreement with the Debtor and the Trustee granting relief from the automatic stay for the Chrysler van and indicated its name to be BankNorth, N.A.

[2] The Debtor's U.S. and Virginia income tax returns for 2004 indicate a tax refund from the former in the amount of $1,410 and a tax liability upon the latter in the amount of $456, apparently paid by credit card.  The U.S. return bears a paid preparer's date of 4/6/2005 but the date of its filing and the date of any refund received are not disclosed by the evidence.

June 28 from the closing of his IRA account.  The difference between these two figures is
$4,262.38.  If one deducts from this sum the $125 budgeted expense per month for
"miscellaneous" and the $98 per month reported excess of earned income over budgeted
expenses for those same three months, one is left with a balance of $3,593.38, which is an
average of $1,197.79 per month.

Contrary to the United States Trustee's assertion that the Debtor's bankruptcy
was not precipitated by sudden illness, calamity, disability or unemployment, the Debtor argues
that a period of unemployment and a considerable reduction in income led him to file
bankruptcy.  In 2002 the Debtor was employed as foundry manager for a New York foundry
where he was making in excess of $100,000 per year.  The Debtor testified he lost this job in
November 2002 when the New York foundry closed.  These events occurred on the heels of the
Debtor's divorce from and failed reconciliation attempt with his second wife.  After the New
York foundry closed, the Debtor faced a period of unemployment and substantially reduced
income.  The Debtor testified without contradiction that until he lost his job in New York, he had
perfect credit.  During his period of unemployment the Debtor unsuccessfully attempted to earn a
living selling insurance while actively searching for other employment in the foundry industry.
Because the Debtor was receiving very little income during that time period, he began to use his
credit cards to pay his day-to-day living expenses, which resulted in a rapidly increasing debt
load.  The Debtor remained essentially unemployed until September 2003 when he was offered a
temporary consulting position at Walker Machine and Foundry in Roanoke, Virginia.  The
Debtor accepted that position and was shortly thereafter hired as the permanent foundry manager
for this company.  As the foundry manager for Walker Machine and Foundry, the Debtor's
income is approximately $75,000 per year, a reduction in yearly income of $25,000 or more as

compared to his level of income at his previous foundry job.

The United States Trustee's primary argument that this is a case of substantial abuse is that Debtor's budget includes excessive monthly expenses that are neither reasonable nor necessary for the maintenance and support of the Debtor.  As such, the United States Trustee argues that reasonable adjustments to, or elimination of, these excessive and unnecessary expenditures would provide the Debtor with disposable income to fund a 36 month chapter 13 plan.  In the Unites States Trustee's post trial brief, he argues that the Debtor's budget, as is set forth in Schedule I, includes at least $695 in expenses that are not necessary for the maintenance and support of the Debtor.[3]  The United States Trustee argues that if the Debtor's budget is adjusted by that amount, the Debtor's expenses would be $2,483, thus the Debtor would have $793 per month in excess disposable income that could be devoted to a Chapter 13 plan.[4]  The United States Trustee estimates that this level of excess disposable income would allow the Debtor to repay over 50% of his unsecured debt.

In arriving at the above conclusion, the United States Trustee examined the Debtor's monthly budget as set forth in Schedule J of the Debtor's petition.  The United States Trustee argues that several expenditures found on Schedule J are excessive or unnecessary.  He first takes issue with the Debtor's $200 monthly stipend to his son, who is attending college, which his schedules characterized as "payments for support of additional dependents not living at your home".  The United States Trustee argues that this is an unnecessary expenditure because

---

[3]     While the United States Trustee's post-trial brief assumes, for the purpose of calculating the Debtor's ability to repay his creditors, that Debtor's budget was only excessive to the extent of $695, as discussed in this opinion, the Trustee's brief goes on to argue that the Debtor's budget was actually excessive to the extent of $895.

[4]     The United States Trustee reached this conclusion by subtracting the Debtor's hypothetically adjusted expenses of $2,483 from his net monthly income of $3,276.

the Debtor already pays court ordered child support in the amount of $1,009 per month via payroll deductions.  At trial the Debtor testified that he sends the additional $200 per month directly to his son to help him with expenses related to college.  The Debtor expressed his belief that his son does not receive the benefit of the court ordered child support because it is paid directly to his first wife.  The Debtor further testified that he was sending this money to his son because he wanted his son to view him as successful and so his son would know that he can rely upon his father.

The United States Trustee next questions the validity of Debtor's expenditure of an estimated $450 per month to make trips to New York to visit his ailing parents.  The Debtor testified that each month he spends an average of $200 on gas so that he can drive to and from New York.  He also testified that during these visits he spends an additional $250 per month for incidentals which he classified as entertainment on his schedules.  In the past these incidentals included gambling, however the Debtor testified that he no longer gambles nor does he provide his parents with funds with which they gamble.  The Debtor stated that these trips are necessary due to the age of his parents and the poor health of his father.  The United States Trustee, however, argues that these expenditures for the Debtor to visit his parents are not the type of expenses that are recognized as reasonable and necessary for purposes of a bankruptcy proceeding.  The United States Trustee also argues that the Debtor has not established any facts regarding his parents' health or other circumstances that would require 2-3 visits per month.  The Debtor testified that he has a sister who lives much closer to his parents and assists his parents with some things, but he testified that it is necessary for him to continue to visit his parents to do work around their home and assist his mother with his father.

The United States Trustee also takes issue with Debtor's food budget of $645 per

month for one person.  The Debtor testified that his food budget is high because he works

approximately 80 hours per week and must eat out for every meal.  When questioned as to

whether he had considered taking sandwiches to work, the Debtor expressed his belief that this

would not be any cheaper than eating out.  In his post-trial brief, the Debtor argues that given his

work schedule and limited time at home, he has neither the time nor energy that would be

required to make nutritious meals to bring to work.  The United States Trustee's post-trial brief

argues that $400 per month should be a more than reasonable food budget for one person even

considering the Debtor's long hours, but no specific evidence to this effect was offered at trial.

The Court notes, however, that had this case been filed two days later, on October 17, 2005, a

food budget of $543 would have been considered reasonable for an individual earning an income

commensurate with that of the Debtor.[5]

      Although not addressed in his post-trial brief, the United States Trustee's initial

complaint also argued that the Debtor's clothing expenditures were excessive at a budgeted

amount of $150 per month.  The Debtor testified that this expenditure is necessary because his

job requires him to wear specially designed shoes for safety reasons.  He also stated that his

work clothes have to be frequently replaced because there are often holes burned into them as a

result of the conditions in which he works.

      The Untied States Trustee's post-trial brief responded to Debtor's testimony at

trial that his rent had increased by $250 per month by pointing out that the Debtor testified that it

would be possible to obtain suitable housing for less than $1,000 per month, between $600 -

---

[5]    Under the Bankruptcy Abuse and Consumer Protection Act of 2005, commonly
referred to as BAPCPA, which became effective as of October 17, 2005, the national allowable
living standard for food expenditures for a single individual with a gross income greater than
$5,834 per month was calculated to be $543 per month for all petitions filed between the dates of
October 17, 2005 and February 12, 2006.

$700 per month.  However, the United States Trustee did not address the Debtor's additional

testimony that he would have to purchase furnishings for a new apartment as the furnishings in

his current residence are owned by his girlfriend, that he would have to pay utilities in addition

to the base rent, and that he would have to come up with funds to pay an initial security deposit.

The Debtor testified that his girlfriend had increased his rent due to increases in utility costs and

taxes.  The Debtor also testified that the rent he is paying would be insufficient to cover the

entire mortgage and utilities for his girlfriend's home.  The Debtor expressed his belief that the

combined cost of the mortgage upon and utilities for the property is approximately $1,700 per

month.  The Debtor testified that he provides his girlfriend with no other support.

At trial the Debtor testified that his car insurance rates had increased

approximately $50 per month since the time he filed his bankruptcy petition.  The Debtor's

Exhibit A reflected that his car insurance had increased to $149 per month, an increase of $52

per month.  The United States Trustee's post-trial briefs did not address this increase in the

Debtor's monthly expenses or question it at trial nor was there any contradictory evidence

presented on this issue.

The Debtor also testified that he would be required to purchase a new car in the

near future as he would no longer have access to the company car that he currently uses.  The

United States Trustee in his post-trial reply brief suggested that in light of the Debtor's

represented budget situation either Mr. Gromada does not actually plan to purchase another car

or that he plans to make some major adjustments to his  claimed budget expenses, but he did not

produce evidence that would contradict the necessity of such a purchase or the $300 per month

payment that the Debtor estimated he would need to undertake to buy a car.

At trial, the United States Trustee questioned the Debtor regarding how he

intended to increase his expenditures by $602 per month to pay his increased rent, his increased

car insurance, and purchase a car even though his Schedules I and J indicated that the he only

has $98 per month in excess disposable income.  The Debtor responded to this line of

questioning by stating that although he was unsure how he would accomplish this feat, he was

confident that would be able reduce his expenses in other areas to such an extent as to allow him

to meet these new and increased obligations.

   The Debtor testified that his debt load was the result of his lost job and that he did

not incur any of his debt in anticipation of filing bankruptcy.  He also testified that when he

received the various loans and extensions of credit, he wanted to pay them back.  The Debtor

stated that among other reasons he continued to obtain credit throughout his unemployment was

because he did not wish to go to jail for failing to pay his child support.  The Debtor testified that

he stopped using the majority of his credit cards in early 2003 and that he stopped paying on his

Chase credit card, which was the one having the largest reported balance in his bankruptcy

filing, in 2003.  At that time the Debtor believed he would be able to find a job that would allow

him to return to his former salary, but it later became clear that he would not be able to find

another job in the foundry industry that paid $100,000 per year.  The Debtor admitted that he

continued to use and make payments on his Sears card until shortly before filing bankruptcy

because it was his first credit card and he wished to maintain it as long as possible.  After the

Debtor stopped using his credit cards, he began to take out loans to make ends meet, to stay

current on his child support obligation, and to service the outstanding debt on his 2002 Chrysler

van.  When questioned by the United States Trustee and the Court regarding an installment loan

opened with LVNV Funding, which is listed in Schedule F as having been opened in April of

2005, the Debtor initially had some difficulty recalling the particulars of the transaction.  After

refreshing his recollection with assistance from his credit report, the Debtor was able to recall

opening the account and that the proceeds had been used to pay his living expenses, to service

the debt on his 2002 Chrysler van, and to allow him to bring his child support payments current.

When questioned regarding when the LVNV Funding account was first opened, the Debtor

initially offered conflicting testimony, but after review of his credit report, the Debtor testified

that the loan was obtained in July of 2004 and was later placed as a collection account in April of

2005.

   The Debtor testified that prior to his bankruptcy petition he made several sizable

gifts to his son over and above the $200 he normally sent every month.  These gifts included two

high school graduation presents, a necklace purchased on credit in the amount of $639 from Kay

Jewelers, apparently in September of 2004, and $1,000 in cash on July 24, 2005, and a birthday

gift of $500 in November 2004.  The Debtor's schedules also reported an additional $1,000 cash

Christmas gift to his son in December 2004.  When questioned regarding these gifts, the Debtor

expressed that given a choice between making these gifts to his son and paying his creditors, he

would choose to make these gifts to his son. Obviously, that is exactly what he did do.

   The Debtor testified that he did not begin to think about filing bankruptcy until

four or five months prior to actually filing his petition in October 2005.  When pressed by the

Court on this issue, the Debtor stated that he believes he began to seriously consider filing for

bankruptcy protection in May of 2005.

   The Debtor's credit report, which was offered as the United States Trustee's

Exhibit 8, indicates that the Debtor has an extensive credit history that long predates his financial

troubles that began when he lost his job in November 2002.  The Debtor's pre-2002 credit

history reveals that he successfully obtained and paid off large loans involving vehicles, real

estate, and unsecured loans.  What happened to the assets he obtained from the proceeds of these

loans was not disclosed by the evidence produced in this case.  The credit report also indicates

that his payment delinquencies, charge-offs, and other negative credit history began during his

period of unemployment in 2003.  Furthermore, according to the credit report, the Debtor

initially borrowed funds from LVNV Funding in 2004.  Then, in 2005, the Debtor's accounts

with LVNV Funding were charged off and placed for collection.

In his post-trial arguments to the Court in support of the Motion to Dismiss, the

United States Trustee makes the following arguments with respect to the *Green*[6]  factors:

*Ability to pay:*

The United States Trustee asserts, based on the figures contained in the Debtor's

Schedules I and J, that the Debtor would have $793 in disposable income if he were to adjust the

expenses in his monthly budget to reasonable levels.  Based on this assumption the United States

Trustee asserts that, after allowing for an assumed chapter 13 expense factor of 10% of the total

payment made to the chapter 13 Trustee, the Debtor could pay over 50% of his unsecured debt

over the course of a 36 month plan.

*Sudden illness, calamity, disability or unemployment:*

The United States Trustee asserts that the Debtor's bankruptcy was not

precipitated by sudden illness, calamity, disability or unemployment based on the fact that the

Debtor was employed at Walker Machine for over two years prior to filing his bankruptcy

petition.  During that time the Debtor was making approximately $6,303 per month and could

---

[6]        *Green v. Staples (In re Green)*, 934 F.2d 568 (4th Cir. 1991).

have paid his creditors.

*Incurred cash advances and made consumer purchases far in excess of ability to repay*:

The United States Trustee asserts that the Debtor made consumer purchases far in excess of his ability to repay.  In support of this argument the United States Trustee argues that within 10 months of filing bankruptcy the Debtor gave his adult son $2,500 in cash gifts and opened a $639 charge account to purchase his son a necklace as a graduation gift.  In addition to these gifts, the Debtor reported gambling losses of $1,000 from June and July of 2005.   Finally, the United States Trustee points to the $5,250 loan that the Debtor received from LVNV Funding only months before he filed his bankruptcy petition according to the information contained in Schedule F.  The United States Trustee is also concerned because the Debtor had some difficulty recalling this loan and how the proceeds had been spent.

*Excessive and unreasonable family budget:*

The United States Trustee asserts that the Debtor's monthly expenses are excessive and unreasonable and that his monthly budget includes at least $695 in excess expenses.  The United States Trustee primarily argues that the $650 per month that the Debtor included in his budget for his visits to his parents and gifts to his son is unnecessary and therefore unreasonable because the Debtor does not have a legal obligation to support his parents or his adult child.  The United States Trustee argues that the Debtor's food budget of $645 per month is unreasonable.  Finally, the United States Trustee argues that Debtor's housing costs which have recently increased to $1,000 per month are unreasonable because the Debtor could

-15-

find suitable housing for between $600 and $700 per month.

*Accuracy of the Debtors' schedules:*

The United States Trustee states that although he does not question the accuracy of the Debtor's schedules, he does urge that "the lack of explanation for many of [the debtor's] expenses calls into question the accuracy of the debtor's budget and whether the expenses listed are in fact necessary."

*Bad faith:*

The United States Trustee argues that Debtor's bad faith is shown by his willingness and ability to afford "$1000 in gambling losses, borrow over $5000 .... spend $250 per month in trips to New York and give his son various gifts in excess of $5500"[7] while at the same time failing to repay his creditors.

## FINDINGS OF FACT

The Court makes the following findings of fact concerning the factors to be considered by it in determining the claim of substantial abuse advanced in the United States Trustee's Motion:

1. The Court finds those facts discussed above which are not indicated to be in dispute between the parties or otherwise the subject of conflicting evidence. The Court further finds,

---

[7]      The United States Trustee determined that the Debtor's gifts to his son totaled in excess of $5,500 by adding together $2,500 in cash gifts discussed previously, the $639 necklace he gave his son, and $2,400 which is the sum of the Debtor's $200 monthly gift to his son over a 12 month period.

and this is not disputed by the Debtor, that his indebtedness is consumer debt within the meaning
of 11 U.S.C. § 707(b).

2. Based on the Debtor's testimony at trial and a careful review of the Debtor's credit
report[8], the Court finds that the Debtor was able to service his debt prior to losing his job
managing a New York foundry in November 2002.  The Court further finds that the Debtor
obtained his loan with LVNV Funding in July 2004 and that in April 2005 it was placed for
collection.

3.  Based principally on the Debtor's apparent ability to fund unbudgeted expenses of
over $1,000 per month as evidenced by a reconciliation of the information contained in his
bankruptcy schedules I and J with the disclosures made in his Statement of Financial Affairs, but
also in lesser part on the unreasonableness of the Debtor's budgeted amount of $430 per month
for recreation, the Court finds by a preponderance of the evidence that, even after allowing for a
$300 per month expense amount as suggested by the Debtor for a replacement motor vehicle, he
has the ability to pay at least $600 per month to a chapter 13 trustee for the benefit of his
unsecured creditors.[9]

4.  For the purpose of this decision the Court will accept the figure of $51,231 contained
in the Debtor's bankruptcy schedules as the amount of his unsecured debt.  For the purpose of

---

[8] United States Trustee Exhibit 8.

[9] The Court wishes to make clear that the finding is based on the evidence before the
Court on the United States Trustee's Motion and does not constitute any advance determination
of the amount of available excess income which the Debtor would be obliged to pay to obtain
confirmation of a chapter 13 plan.  For example, the Debtor's estimate of a $300 per month car
payment may prove optimistic.  The chapter 13 Trustee is in a much better position than the
Court to evaluate the Debtor's expenses in comparison with the budgets of the numerous other
debtors with whom she deals.

this decision the Court finds that 10% is an appropriate cost factor[10] for the administrative expense of a chapter 13 case.

5.  On the basis of the foregoing findings, the Court finds that the Debtor has the financial ability to complete a chapter 13 plan which would provide for the payment of a net amount of $19,440 to his unsecured creditors over a 36 month plan, which would amount to approximately 38% of his unsecured debt.

6.  The Debtor's bankruptcy filing was occasioned by two principal factors, the initial one being the loss of his accustomed job at the New York foundry when it closed and from which he had earned $100,000 or more annually, an event not shown to have been within his reasonable control, and the second being his unwillingness to sufficiently adjust his living expenses to reflect the level of his financial obligations and his reduced income and income expectations, a lifestyle choice for which he is responsible.

7. To the extent that it is a question of fact, the Court finds that the Debtor, based on his level of indebtedness, assets, and regular income, would be eligible to proceed in a chapter 13 case.

## CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on July 24, 1984.  A motion to dismiss for substantial abuse is a "core"

---

[10] The United States Trustee failed to introduce any evidence to such effect but did argue that it was the appropriate factor to use to determine the amount which could be available in a theoretical chapter 13 plan and this assertion was not challenged by the Debtor.  Based on hearing a number of similar motions filed by the United States Trustee, an assumed 10% expense factor has been both customary and unchallenged.

-18-

bankruptcy matter pursuant to 28 U.S.C. § 157(b)(2)(J) and (O).

A court may dismiss a Chapter 7 bankruptcy case upon a motion by the United States Trustee if the case is filed by a debtor with primarily consumer debts and granting relief would be a substantial abuse of Chapter 7 provisions. 11 U.S.C. § 707(b).  *Collier on Bankruptcy* points out that Congress was concerned with the abuse of consumer debt and that § 707(b) of the Code was adopted as "part of a package of consumer credit amendments" included in the Bankruptcy Amendments and Federal Judgeship Act of 1984.  6 *Collier on Bankruptcy* ¶ 707.LH[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.).  Section 707(b) only applies to an individual debtor whose debts are "primarily consumer debts."  Rule 1017(e) of the Federal Rules of Bankruptcy Procedure, implementing this section, provides that the "United States [T]rustee shall set forth in the motion all matters to be submitted to the court for its consideration at the hearing."  It is unmistakably clear that such motions are not to be readily granted and that the onus is upon the United States Trustee to prove that the case is abusive, both by the quoted language in Rule 1017(e) and also by the last sentence in § 707(b), granting a presumption in favor of the debtor.

The Bankruptcy Code does not attempt to define "substantial abuse" and courts have struggled to apply this provision given the plethora of factual situations presented by debtors.  In summary, Congress appears to have been concerned about persons who knowingly or recklessly live beyond their means, who live the good life using the resources of their creditors to do so and then choose to walk away from their debts even though they have the financial ability to pay them and although their income levels may have given them the access to

the credit markets which have made their liberal lifestyles possible.[11]

The Fourth Circuit Court of Appeals has adopted a "totality of the circumstances" test in determining whether substantial abuse has occurred.  *Green v. Staples (In re Green)*, 934 F.2d 568, 570 (4th Cir. 1991).  In *Green*, the Court listed a number of factors to be considered:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
> (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
> (5) Whether the petition was filed in good faith.

*Id.* at 572.  It further held that:

> Exploring these factors, as well as the relation of the debtor's future income to his future necessary expenses, allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors.

*Id.*  The Court in *Green* further pointed out that a vast majority of circuit courts have held that the debtor's ability to repay is the primary factor to be considered.  *Id.*  District Judge Kiser of

---

[11] *Collier on Bankruptcy* points out that in enacting § 707(b),

> Congress rejected attempts by the consumer credit industry to permit creditors to move for dismissal of cases on the basis that the debtor had an ability to pay debts.  It also rejected the idea that a case should be dismissed simply because a debtor could pay a "reasonable portion" of his or her debts (defined as 50%), as well as the use of a five year period to determine whether such portion could be paid. The resulting section 707(b) is thus more narrow than the provisions originally sought by the consumer credit industry and targeted only at debtors who can pay their debts without difficulty.

6 *Collier on Bankruptcy* ¶ 707.LH[4] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.).

this District has analyzed *Green* in *In re Harrelson*, 323 B.R. 176 (W.D. Va. 2005).  This

opinion offers a thorough recent analysis by a court to which an appeal from this Court lies

detailing how a motion pursuant to § 707(b) for alleged substantial abuse ought to be

determined.  This Court will undertake, therefore, to apply the methodology of that decision in

deciding the present Motion.

*Ability to repay*:

In *Harrelson*, Judge Kiser emphasized that "the ability to repay, although not a

dispositive factor, is the primary factor in determining substantial abuse." *Id.* at 179 (citing *Shaw*

*v. U.S. Bankr. Adm'r*, 310 B.R. 538, 540 (M.D. N.C. 2004) and *In re Norris*, 225 B.R. 329, 331-

32 (Bankr. E.D. Va. 1998)).  Judge Kiser went on to note that *Green* requires courts to look at

the totality of the circumstances.

> A court may not dismiss debtors' ability to repay debts as an irrelevant
> factor.  On the contrary, it is the primary factor in determining substantial
> abuse. . . . Courts have held that a debtor's ability to repay weighed in favor
> of a substantial abuse finding when the debtors could only pay 29% and
> 47% of their unsecured debt over a period of three years.

*Id.* at 180 (citing *Shaw*, 310 B.R. at 540 and *Norris,* 225 B.R. at 332).  The *Green* opinion

expressly recognizes, however, that "solvency alone is not a sufficient basis for a finding that the

debtor has in fact substantially abused the provisions of Chapter 7." *Green,* 934 F.2d at 572.

This Court has made a finding of fact that the Debtor has the ability to propose a 36 month

chapter 13 plan which would provide for payment of approximately 38% of his unsecured debt,

which is within the range noted with clear approval by Judge Kiser in *Harrelson*.  Accordingly,

this factor weighs in favor of granting the Motion.

*Petition filed as a result of a sudden illness, calamity, disability or unemployment:*

The court in *Harrelson* held that this factor weighs in favor of dismissal when the filing is not due to some "unforeseen tragedy." *Harrelson*, 323 B.R. at 178 (citing *Norris*, 225 B.R. at 333). Usually the evidence on this point is fairly clear cut, but that is not the case here. But for the loss of his New York foundry job, the Court is satisfied that Mr. Gromada would not have found it necessary to file a bankruptcy petition and would not have done so. Yet the Court cannot overlook Mr. Gromada's unwillingness to adjust his budget to reflect his new circumstances. While his desire to make significant gifts to his son upon the occasions of the latter's high school graduation and birthday, and at Christmas are understandable in some sense as a natural one for a father proud of a deserving son, his decision to act upon that desire violates the principle that the law requires one to be just before he is generous, that is, one is obliged to endeavor to meet one's legally enforceable obligations before considering incurring expenses for gestures which are kind, thoughtful and generous, but not obligatory. If Mr. Gromada had been willing to place a high importance on paying the creditors who made it possible for him to live while seeking satisfactory new employment, he might well have been able to do so. Application of this factor invites the Court to enter upon an inquiry as to whether the bankruptcy filing has been the result of some occurrence beyond a debtor's reasonable ability to control or rather from circumstances for which the debtor can reasonably be faulted. The Court's determination that both sets of circumstances were at work in Mr. Gromada's financial downfall persuades it that the net result is a tie and therefore this factor should not be weighed in the balance of the various *Green* factors.

*Whether the Debtor incurred cash advances or made consumer purchases far in excess of his ability to pay*:

Case authority on this point varies widely. In *In re Vansickel*, 309 B.R. 189, 211-

12 (Bankr. E.D. Va. 2004), the court held that "relatively modest" debts including $28,000 in

unsecured debt did not weigh in favor of dismissal, holding that due to the statutory presumption

in favor of granting a debtor bankruptcy relief, the United States Trustee did not meet his burden

of proof in establishing substantial abuse.  In *In re Norris*, 225 B.R. at 333-34, however, the

court held that this factor did weigh in favor of dismissal when the debtors incurred more than

$90,000 of unsecured debt, lived in an expensive home, dined out, and utilized their 401(k) plans

to create a reserve fund for future expense.  Additionally, another district court held this factor

weighed in favor of dismissal when the debtors purchased a $4,000 bedroom suite, spent $1,000

a month for their daughter's college expenses, lived in a home they could not afford but were

unwilling to leave, and purchased two new cars.  *Shaw,* 310 B.R. at 540-41.

In this case there has been no claim of use of consumer credit to obtain cash

advances.[12]   The United States Trustee has challenged, however, the voluntary gifts of money

and a necklace by the Debtor to his son and the gambling losses which occurred, according to the

Debtor's testimony, after he started thinking seriously about filing bankruptcy.  While counsel

for the United States Trustee also questions the $5,250 loan obtained from LVNV Funding, that

seems to be based more upon the reported timing of that loan in April of 2005 than any other

factor.  The Court has found that such loan was actually obtained in 2004 more than a year

before the bankruptcy filing and, according to the Debtor's testimony, was used to bring his

child support current and pay other living expenses.  Even so, this loan is somewhat troubling to

the Court as well because it was obtained the year after the Debtor ceased paying at least some of

---

[12] Counsel for the United States Trustee has not advanced any argument that the $5,250 loan the Debtor obtained in 2004 from LVNV Funding amounted to the use of consumer credit to obtain a cash advance.

his credit card accounts.  No evidence was offered, however, as to what efforts, if any, the

Debtor made to repay this loan after he had obtained it.  In any case, it does not appear that this

loan was used for the purpose of making consumer purchases; at least no evidence was

introduced to that effect.  The difficult part of applying this factor is frequently drawing the line

which separates expenditures which simply "exceed" the particular's debtor's ability to pay from

those which "far exceed" such ability.  Most bankruptcy cases involve at least some transactions

where debtors have incurred consumer debt which, as it turned out, exceeded the respective

debtors' abilities to pay.  In this case the Court will disregard the $200 per month contributions

to the Debtor's college-aged son for his expenses.  It accepts the Debtor's explanation that he

believed that his son was not actually receiving what he needed from the compulsory child

support payments which he made to his former wife, and such payments are certainly not so

large as to suggest any intent to provide luxuries to his son at the expense of his creditors.

Accordingly, the Court will direct its attention to the three gifts of money within the year

preceding the bankruptcy filing in the aggregate amount of $2,500 and of a necklace which cost

$639.  Absent the financial obligations which he already had and the claimed level of living

expenses, such gifts were certainly not excessive for an individual earning the income which Mr.

Gromada was then being paid.  No evidence has been offered that the cash gifts were made with

the proceeds of consumer credit extensions.  The Court cannot assume in the absence of any

evidence on the point that Mr. Gromada made these cash gifts from any sources other than his

earnings, his tax refunds, and the closing of his IRA account.  The most that can be said is that

he should have used this money to make payments upon the consumer credit which he already

owed but failed to do so.  The same observation may also be made concerning the $200 per

month additional support discussed above which he provided to his college-aged son.  The Court

is left then with the $639 necklace which he obtained on credit for his son's high school

graduation.  The Court in all fairness cannot say that such purchase, even in light of his financial

circumstances in 2004 and 2005, "far" exceeded his financial ability to pay for it based on his

gross income of approximately $75,000 per year.  Accordingly, this factor must be counted on

the Debtor's side of the ledger.

*Excessive and unreasonable family budget:*

In his Motion the United States Trustee challenges the $200 per month the Debtor has

been providing to his son to assist him with his living expenses while a college student, the $150

per month clothing expense, the $645 per month for food expense, and the $430 per month for

recreation.  The Court will consider those items in that same order.  The Debtor testified that he

remains liable for child support paid to his former wife until his son graduates from college.  No

evidence to the contrary was introduced.  The Debtor testified as to why he provided this money.

His expressed belief that his son is not getting what he actually needs from the support paid to

his mother, in the absence of any evidence to the contrary, is a legitimate concern.  His wish that

his son see him as successful and a dependable source of needed help is not a satisfactory reason

to provide such support to the prejudice of his creditors, but such wish does not negate the reality

of his moral responsibility, and perhaps under New York law his legal obligation as well, to

assist his college-aged son with his educational and living expenses which he believes in good

faith are not being adequately met through the compulsory payments he is making to his son's

mother.  While the United States Trustee has argued that such expenditure is unreasonable, he

has not offered any evidence to that effect.  The undersigned judge of this Court, having assisted

his own two sons in attending college, is not persuaded just by argument that it is unreasonable

for the Debtor to provide $200 per month directly to his son while the latter is attempting to

obtain a college education.

   While it may be that the Debtor doesn't actually spend $150 per month for

clothing or that such amount is unreasonable, the Debtor testified as to the basis for and the

necessity of such amount.  The United States Trustee has failed to offer any evidence to the

contrary.  The only witness offered by the United States Trustee was the Debtor.  The only

evidence on point before the Court supports such budget item.  Therefore, there is no basis upon

which this Court properly may hold that such amount is excessive and unreasonable.  After all, it

is the burden of the United States Trustee to prove such contention, not that of the Debtor to

persuade the Court to the contrary.

   The Court is left in the same situation with respect to the Debtor's food budget of

$645 per month.  While counsel for the United States Trustee has argued that such amount is

unreasonable, he has not offered any evidence, such as the testimony of a chapter 13 trustee or

one of the employees of his office, supporting that argument.  If the Court were to reject the

Debtor's testimony that $645 per month is a reasonable and appropriate expenditure for his

monthly food budget, it still would be left with no evidence, other than counsel's argument

unsupported by evidence, upon which some other amount might be settled upon.  While the

Court might well not be persuaded by the Debtor's testimony if he had the burden of proof on

this issue, such skepticism cannot substitute for the evidence not offered by the United States

Trustee to carry the burden of proof that the latter did have.  Accordingly, the Court rejects this

contention on the ground of failure of proof.   The Court does agree, however, with the United

States Trustee's contention made in his post-trial arguments that the Debtor's testimony of an increase in the rent expense paid to his girlfriend to $1,000 per month is excessive.  This was evidence offered by the Debtor at trial to vary the amount of such expense claimed in his Schedule J.  The Court is not persuaded that such increase is something which has actually occurred, and even if it has actually occurred, that it is necessary for the Debtor to incur because other accommodations are not available to him at the expense level reported in Schedule J.  When the Debtor seeks to prove an increase in living expenses between the filing date and the time of trial, the burden of proof as to such claim should be upon him rather than upon the United States Trustee to establish the contrary.  Such contention here has not been established to the satisfaction of the Court.

The last item to be considered is the budget item of $430 per month for recreation.  This amount seems to be composed mainly of the Debtor's expenses in traveling to New York on a regular basis to attend to the needs of his elderly parents, who live independently but apparently need some assistance, and $186 per month for cigarettes.  The United States Trustee has not challenged the $550 per month budgeted expense for transportation except insofar as it includes  the cost of gasoline for regular trips to New York.  This amount does not include any amount for a vehicle payment.  While the Court is reluctant to endorse even by implication the proposition that it is appropriate for a bankruptcy debtor to spend $186 a month on cigarettes to the prejudice of his creditors, the United States Trustee offered no evidence to the effect that such an expense would be disallowed in a chapter 13 case and thereby theoretically be available for creditors in a chapter 13 plan and has never voiced any criticism of such expenditure.  The Court has found few published decisions explicitly discussing the issue of

a debtor's budgeted expense for cigarettes in the context of a section 707(b) substantial abuse

motion.  Based on those published decisions, it appears that the weight of the authority is

favorable to the debtor.  *See In re Regan*, 269 B.R. 693, 698 (Bankr. W.D. Mo. 2001)(approving

the debtor's budgeted expense to purchase approximately two cartons of cigarettes per month)

*and In re Buntin*, 161 B.R. 466 (Bankr. W.D. Mo. 1993)(holding that the expense of two packs

of cigarettes per day would be reasonable for a household of two individuals earning a combined

net income of $2,846.71 per month, however the debtors' budgeted expense of five packs per

day was both unreasonable and unnecessary). *But see In re Peluso*, 72 B.R. 732, 738 (Bankr.

N.D. N.Y. 1987)(holding the debtor's budgeted expense for cigarettes was unreasonable because

this additional recreational expense made the debtor's combined recreational and entertainment

expenses unreasonable)**.**  *See also Minoo Gharavi v. United States Dep't of Ed. & Educ. Credit

Mgmt. Corp. (In re Gharavi)*, 335 B.R. 492 (Bankr. D. Mass. 2006)(holding that cigarette

expenses are not unreasonable per se in the context of an adversary proceeding seeking the

discharge of educational loans on the ground of alleged undue hardship) *and In re Woodman*,

287 B.R. 589 (Bankr. D. Me. 2003)(holding that tobacco expenses are not unreasonable per se in

the context of an objection to confirmation for a chapter 13 plan).  The Court does agree with the

United States Trustee, however, that budgeting approximately $3,000 a year for miscellaneous

expenses on numerous visits to New York is excessive for someone who is not paying his

creditors their due.  That is not to say that the Debtor is obliged to forego making any such trips

to assist his parents or see his son while he labors under a chapter 13 plan, but rather that the

Court is persuaded by a preponderance of the evidence presented here that the expense of

making a reasonable number of such trips on an annual basis appears to be covered by the

Debtor's regular food budget, which provides for his eating away from home as routine, and his regular $550 per month budgeted transportation expense, not including vehicle payment.  One of the significant factors leading the Court to the conclusion that the Debtor's proposed budget is unreasonable is that although his bankruptcy schedules reflect an available income in excess of expenses of only $98 per month and $125 per month for miscellaneous expenses, his Statement of Financial Affairs records that he made payments to creditors within the three calendar months preceding his bankruptcy filing on October 15, 2005 of $3,210, or an average of $1,070 per month.  It is true that the Statement of Financial Affairs also includes a disclosure that on June 28, 2005 the Debtor closed out an IRA account at Wachovia Bank, N.A. having a balance of $1,572.62, but it also reflects other cash expenditures by the Debtor exceeding that sum for the $500 gambling loss on July 24, 2005, a cash gift to his son, on the same date as the gambling loss, of $1,000, and the payment of $1,125 to his bankruptcy counsel on September 21, 2005 for retainer and filing fee for his bankruptcy petition.  Obviously, there is some room in the Debtor's budget for adjustments when the Debtor sees fit to make them.  Accordingly, the Court concludes that this factor supports granting the motion.

*Accuracy of the Debtors' schedules:*

The United States Trustee does not challenge the accuracy of any information contained in the Debtor's bankruptcy schedules as far as his assets and liabilities are concerned, but does challenge the accuracy and necessity of his budgeted expenses contained in Schedule J. The Court is unable to square the information contained in Schedule J with the previously discussed disclosures made in the Statement of Financial Affairs.  Accordingly, it concludes that one or the other of them must be materially incorrect and that it is much more likely that the

-29-

budget figures in Schedule J are wrong.  In his opinion in *Harrelson,* District Judge Kiser held

that under the Fourth Circuit's decision in *Green,* inaccuracy of bankruptcy schedules is a factor

to be weighed, regardless of the Debtor's motive or intent to deceive, and therefore relevant.

*Harrelson,* 323 B.R. at 179.  Accordingly, this factor falls in favor of the United States Trustee

and supports granting the Motion.

*Bad faith:*

District Judge Ellis of the Eastern District of Virginia in *McDow v. Smith*, 295

B.R. 69 (E.D. Va. 2003), a case involving a motion to dismiss for "cause" under 11 U.S.C. §

707(a), stated generally that "a debtor's 'bad faith' or 'lack of good faith' is evidenced by the

debtor's *deliberate* acts or omissions that constitute a misuse or abuse of the provisions, purpose,

or spirit of the Bankruptcy Code." *Id.* at 74 (emphasis added).  Of particular significance on this

point would be a finding of wrongdoing on the part of the debtor, either in the accumulation of

the debt or in the filing of the Chapter 7 petition.  *Id.* at 82.  Most cases resulting in a finding of

bad faith involve egregious factual situations wherein the debtor has accumulated massive

amounts of credit card debt with no intent to repay the debt, lives a lifestyle far above what he or

she could afford, or intends to avoid a large single debt.  *In re Zick*, 931 F.2d 1124, 1129 (6th

Cir. 1991); *see also In re Haddad*, 246 B.R. 27, 38 (Bankr. S.D. N.Y. 2000) (in addition to living

an extravagant lifestyle, debtor was not candid in disclosure requirements and attempted to claim

a wedding band as exempt while unmarried); *In re Ragan*, 171 B.R. 592, 596 (Bankr. N.D. Ohio

1994) (case dismissed under § 707(b) after debtor withdrew more than $160,000 from IRA and

recklessly spent it all with little or no regard for obligations to creditors).

In this case there are undeniably some circumstances about the Debtor's conduct

which trouble the Court, the two principal ones being the Debtor's largess to his son in preference to his obligations to his creditors, and his seeming lack of concern about paying his creditors other than those who have power over him, namely the penal sanctions possible for non-payment of his child support obligation and the debt to the principal of a former employer who might be able to affect his relationship with his current employer. Nevertheless, these attitudes, while perhaps disappointing, are probably more common to the general run of mankind rather than being particularly shocking and do not rise to the level of bad faith, or the absence of good faith, in the filing of a bankruptcy petition. There is no evidence before the Court that the Debtor took pre-bankruptcy actions to convert non-exempt property to exempt property or incurred debts with the knowledge or expectation that he expected to discharge them in a bankruptcy case.

The United States Trustee contends in his post-trial briefs that the combination of Mr. Gromada's gifts to his son, the gambling losses several months before bankruptcy, and the $5,250 loan from LVNV Funding demonstrate that Mr. Gromada was not acting in good faith towards his creditors. While the issue of good faith was in significant doubt as long as it appeared to the Court, and presumably the United States Trustee as well, that the Debtor had obtained a cash loan in excess of five thousand dollars within approximately six months of his bankruptcy filing and had difficulty in accounting for the disposition of its proceeds, the Court's ultimate finding of fact that such loan was obtained during the Summer of 2004 rather than in April of 2005 takes most of the sting out of this particular circumstance. While the gifts to the son are troublesome, they appear to be a continuation of a pattern established by Mr. Gromada during more prosperous times, rather than evidence of an intent to take advantage of his creditors

by giving his son money obtained from his creditors and which he had no reasonable expectation

of repaying.  The gambling losses in June and July of 2005 are troublesome as well, but to his

credit Mr. Gromada disclosed them and offered no excuse or rationale, such as that he hoped to

win enough money to pay his creditors, and simply offered that he had made a mistake and had

not repeated it on subsequent trips back home to visit with his parents.  Again there is no

evidence that he gambled away money obtained from his creditors with no reasonable

expectation of repaying such extensions of credit.

Finally, but also importantly, the United States Trustee failed to set forth in his Motion

any reference to these matters as was his responsibility under Rule 1017(e)(1).  This Rule was

obviously adopted to inform debtors before trial of the matters they needed to be prepared to

defend at a trial or hearing upon a motion to dismiss for alleged substantial abuse.  All of these

particular facts were disclosed by the Debtor in his original schedules and the Statement of

Financial Affairs, so they were certainly known to the United States Trustee prior to the filing of

the Motion.  While the Court concedes that it has concerns of its own involving Mr. Gromada's

good faith in obtaining the LVNV Funding loan as well as purchasing on credit the necklace for

his son after he had stopped paying on some of the credit card accounts, the United States

Trustee has failed to produce evidence, such as a failure to make any payments upon such

obligations, if such was the case, upon which a finding of the Debtor's bad faith as to such

specific creditors might be based.  Accordingly, the Court concludes that bad faith on the part of

the Debtor has not been established by the United States Trustee.

*Other factors:*

The Court of Appeals' opinion in *Green* did not hold that the factors it

-32-

enumerated were exclusive or exhaustive.  It adopted a "totality of circumstances" test which
called for consideration of factors "such as" the ones specifically listed.  *Green,* 934 F.2d at 572;
*see also Vansickel,* 309 B.R. at 169 n.9 (stating that the *Green* list is illustrative rather than
exhaustive).  The parties have not suggested other factors to be considered by the Court and it
has not identified any in its own review of the facts presented.

DECISION

The Court has determined that three of the applicable six factors under the
teaching of *Green* and *Harrelson*, including the most important factor of ability to repay, weigh
in favor of granting the Motion.  Two of the factors, including the important one of good faith,
weigh in favor of denying the Motion.  The remaining factor concerning the underlying cause of
the bankruptcy filing has been adjudged to be a tie and has been disregarded for the reasons
noted above.  The sum total of these factors, under the instruction of *Harrelson,* outweighs under
the circumstances presented here the statutory presumption in favor of Chapter 7 relief provided
in 11 U.S.C. § 707(b), even though the issue is a close one which has required extended
consideration by the Court.

For the reasons stated, the Court by separate order will grant the United States
Trustee's Motion to Dismiss unless the Debtor, within fifteen (15) days of the entry of the
Court's contemporaneous order carrying out this decision, files a motion to convert his case to
one under Chapter 13 of the Bankruptcy Code.

ENTER this 15th day of December, 2006.

William F. Stone, Jr.

_____
United States Bankruptcy Judge